**Robert OSTERGARD and Jean Ostergard, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

**Civ. A. No. 81–1276–G.**

United States District Court, D. Massachusetts.

Feb. 12, 1987.

Robert P. O'Reilly, Reed & O'Reilly, Boston, Mass., for plaintiffs.

Martha B. Sosman, Asst. U.S. Atty., Boston, Mass., for defendant.

## OPINION

GARRITY, District Judge.

Plaintiffs sue under the Federal Tort Claims Act[1] to recover damages for an alleged lack of informed consent to a vasectomy operation performed on Mr. Ostergard at the United States Public Health Service Hospital in Brighton, Massachusetts, in 1977. Subsequent to the operation, Mr. Ostergard fathered a child who was born with severe deformities. Plaintiffs now seek damages for the alleged "wrongful conception" of this child. With the assent of the parties, issues of liability and damages were severed and issues of liability were tried before the court on June 10–12, 1986. Pursuant to Fed.R.Civ.P. 52(a), the court now makes the following findings of fact.

## I. FINDINGS OF FACT

Many facts as to liability were stipulated by the parties in a written stipulation of facts filed before trial. The plaintiffs, Robert and Jean Ostergard, were married in 1963. They had two healthy, normal children born on June 5, 1965 and June 24, 1968. The Ostergards had no family history of congenital abnormalities.

After the birth of their second child, the plaintiffs decided, for financial reasons, not

---

1. Count one of the complaint alleges, in breach of contract, that the Public Health Service doctors guaranteed a successful vasectomy; and the first section of plaintiffs' trial brief is devoted to their breach of contract claim. Regarding that claim, this court lacks jurisdiction, which lies in the United States Claims Court, because that claim exceeds $10,000 in amount. 28 U.S.C. § 1346(a)(2).

to have any more children. Mrs. Ostergard was taking oral contraceptives to prevent pregnancy. However, by 1977, she was experiencing a diminution of sexual interest, which she attributed to her use of the pill over an eleven-year period. Mrs. Ostergard, therefore, consulted Dr. McCormack, a United States Public Health Service doctor who specialized in obstetrics and gynecology, about obtaining a tubal ligation. Dr. McCormack advised her that a tubal ligation was a fairly complicated operation requiring hospitalization and that her husband could have a vasectomy, which was a comparatively minor surgical procedure and could be performed on an outpatient basis.

Mr. and Mrs. Ostergard, whose educations had ended in the eighth and ninth grades, respectively, discussed their options between themselves and decided that a vasectomy was preferable to a tubal ligation. They contacted the Public Health Service to schedule an appointment for the vasectomy.

On May 24, 1977, the plaintiffs went to the Public Health Service to sign a consent form. Prior to signing the form, they met with Dr. Anthony Filoso to discuss the vasectomy operation. The court finds that Dr. Filoso informed the plaintiffs that the operation should be considered permanent. His warning focused almost exclusively on the irreversibility of the procedure and was intended to ensure that Mr. Ostergard was prepared psychologically to accept permanent sterility. Dr. Filoso further told the plaintiffs to continue practicing birth control after the operation until a test confirmed that Mr. Ostergard had a zero sperm count. However, the court finds that Dr. Filoso did not inform plaintiffs, who had no previous reliable knowledge about such matters, that a vasectomy could fail to sterilize a man permanently and that, consequently, there was a possibility of pregnancy associated with this method of birth control.

The consent form, which was admitted in evidence and is appended to this memorandum as Exhibit 1, and which was signed by both plaintiffs, was a standard Public Health Service "Vasectomy, permanent" form. The form set forth the major complications of infection and bleeding associated with vasectomies and indicated in bold type that the procedure was not reversible. It was clearly designed to ward off claims by patients who later became dissatisfied with sterility. It also included a warning similar to Dr. Filoso's that an alternative method of birth control had to be used until a later test confirmed the absence of sperm in the seminal fluid.

On September 9, 1977, a vasectomy was performed on Mr. Ostergard by Dr. Sarocci during an outpatient visit at the Public Health Service Hospital in Brighton. Subsequent to the operation, a pathological examination of the segments removed from the vas deferens, or tubular structures, on both sides of Mr. Ostergard's testicles confirmed that both vas deferens had been completely severed. On December 6, 1977, Mr. Ostergard returned to the Public Health Service to leave a specimen for the necessary sperm count. On January 19, 1978, he returned for a follow-up visit and to obtain the results of the sperm count. Mr. Ostergard was informed by a Public Health Service employee that the laboratory had confirmed that the sperm count revealed absolutely no sperm and "to go home and have fun." [2]

By December 1, 1978, Mrs. Ostergard was pregnant. She had not had sexual intercourse with anyone other than her husband. A repeat sperm count performed on Mr. Ostergard revealed a sperm count of approximately 11 million per millimeter, with 15% motility and normal morphology, a count which indicated that he was capable of fathering a child.

On June 20, 1979, Mrs. Ostergard gave birth to a baby girl, Mary Jean Ostergard. Mary Jean was born with multiple physical

2. This statement may have been an implied misrepresentation that Mr. Ostergard's sterility would be permanent, on which plaintiffs relied. But it is not actionable. Claims arising out of misrepresentation are excluded from coverage by the Federal Tort Claims Act. 28 U.S.C. § 2680(h).

and mental defects which required extensive and frequent hospitalization, surgery and other major medical care, which continued until her death on October 1, 1985.

The court finds, based on the evidence presented at trial, that the failure of Mr. Ostergard's vasectomy to render him permanently sterile resulted from a recanalization, i.e., the rejoining of the severed ends of the vas deferens through the body's natural healing process. Recanalization, although a rare occurrence, was well known by the medical community in 1977. However, Mr. Ostergard was not informed of the possibility of recanalization by either his counseling physician, Dr. Filoso, or his surgeon, Dr. Sarocci, prior to signing the consent form. While Dr. Filoso informed Mr. Ostergard that a vasectomy might fail due to technical surgical error, he led Mr. Ostergard to believe that once subsequent tests revealed a zero sperm count, any risk of failure was completely and permanently eliminated. The consent form signed by plaintiffs did not mention failure due to recanalization and, in fact, stressed the permanency and irreversibility of the sterility achieved by vasectomy. Finally, Mr. Ostergard's belief that technical surgical error was the only type of failure associated with vasectomy was reinforced by the Public Health Service employee who informed Mr. Ostergard that his sperm count was zero and to "go home and have fun."

## II. CONCLUSIONS OF LAW

Liability under the Federal Tort Claims Act is governed by "the law of the place where the [negligent or wrongful] act or omission occurred", 28 U.S.C. § 1346(b). Hence the court must look to the law of the Commonwealth of Massachusetts and reach a conclusion in accordance with decisions of the Supreme Judicial Court. The question presented in FTCA cases is not, "How should the case be decided?" but rather, "How would it be decided by a Massachusetts state court?" In the instant case, there are two Supreme Judicial Court decisions squarely in point.

A. Materiality:

Under the law of Massachusetts, a physician owes to his patient the duty to disclose in a reasonable manner all significant medical information that the physician possesses or reasonably should possess that is material to an intelligent decision by the patient whether to undergo a proposed procedure. *Harnish v. Children's Hospital Medical Center,* 1982, 387 Mass. 152, 439 N.E.2d 240. "Materiality may be said to be the significance a reasonable person, in what the physician knows or should know is his patient's position, would attach to the disclosed risk or risks in deciding whether to submit or not to submit to surgery or treatment." *Id.* at 156, 439 N.E.2d 240.[3] Materiality is a product of the severity of the potential injury and the likelihood that it will occur. For example, if the probability that an injury, no matter how severe, will occur is so remote as to be negligible, then the possibility of that injury occurring cannot be considered a material factor in the patient's decision. *Precourt v. Frederick,* 1985, 395 Mass. 689, 694–95, 481 N.E. 2d 1144.

In the instant action, the information which was not disclosed to Mr. Ostergard was the possibility of recanalization and the resulting restoration, without warning, of his fertility. Obviously, though, the ultimate harm to which he was exposed was the possibility that his wife could become pregnant. With regard to the consequences resulting from pregnancy, both the Ostergards testified that another child would endanger the family's financial security. There was no evidence to suggest that pregnancy posed a risk to Mrs. Ostergard's health or that the resulting child would be abnormal. In short, the nature of the risk from the Ostergards' viewpoint was the financial burden of raising a third child.

---

3. Following the lead of *Canterbury v. Spence,* D.C.Cir.1972, 464 F.2d 772, 783, the Supreme Judicial Court adopted this as "the better rule", *Id.* 387 Mass. at 157, 439 N.E.2d 240, in preference to the customary practice standard observed in many jurisdictions, a standard perceived to be less favorable to patients.

Regarding the likelihood of recanalization, expert testimony showed that the failure rate of vasectomy due to recanalization is between .08% and .36% of all patients.[4] Additionally, one article cited by defendant's expert indicated that recanalization is even more infrequent after a post-operative zero sperm count, occurring in only .04% of patients. On the other hand, the phenomenon of recanalization, however remote, was well known to qualified physicians in 1977 and was or should have been known to the Public Health Service doctors.

Thus, the question which *Harnish* directs the court to address is whether a roughly 1 in 1000 risk of recanalization is a factor which a physician should reasonably recognize as significant to a reasonable patient in plaintiff's position in deciding whether to have a vasectomy. To ask the question is to perceive its limitations as a formula for determining materiality in the circumstances of this case. There may, of course, be situations, e.g., previous toxic pregnancies or deformed offspring, where recanalization and pregnancy pose a serious risk to the mother or fetus such that even the miniscule risk would be significant to the patient.[5] But here the foreseeable consequence of pregnancy was economic hardship, a kind of harm that arguably lacks the degree of severity necessary to tip the balance in favor of disclosure. In the circumstances of this case, the *Harnish* rule's focus on the severity of the potential injury and the likelihood of its occurrence seems to distort the materiality inquiry by confining it to two factors only marginally relevant to vasectomy operations.

Recanalization and pregnancy do not conform to traditional notions of "injury." Recanalization, rather than disabling or disfiguring the patient, actually restores him to the physical condition he was in prior to the operation. Similarly, pregnancy is not ordinarily perceived as an injury, much less an injury of sufficient severity to trigger the physician's duty to disclose. Furthermore, unlike most adverse consequences of medical treatment, pregnancy may be reversed—some patients may decide to avoid the birth of an unwanted child by having an abortion. Thus, given the remoteness of recanalization and its relatively minor adverse consequences, such as the economic consequences alleged here, defendant has argued that it does not satisfy the *Harnish* standard of materiality.

However, recanalization is more than just an adverse development following a vasectomy or a dangerous side effect. It is a total failure of the surgical procedure undertaken and a complete frustration of the only purpose of the operation. Furthermore, the evidence before the court indicates that physicians do recognize the risk of recanalization as significant to vasectomy patients. This suggests that factors in addition to severity and probability figure prominently in the vasectomy context. First, in view of the elective nature of vasectomy, risks which might be considered minor or remote in connection with other kinds of medical treatment, might reasonably lead a patient to decide against a medically unnecessary operation. Secondly, while the risk of failure might not, in and of itself, cause a patient to change his mind, it could tip the scale for a patient with other reservations about the procedure. For example, a patient might be anxious about the psychological ramifications of sterility and decide, upon being told that vasectomy can fail,[6] that it is no longer his desired choice.

From the physician's perspective, disclosure of the risk of recanalization may be important for reasons other than obtaining the patient's consent to the operation. One

4. Although plaintiffs' expert opined that the failure rate was closer to 2%, this figure was taken from a 1966 study of a small group of patients and is not supported by either recent scientific studies and literature or the clinical experiences of the other physicians who testified.

5. *See, e.g., Hartke v. McKelway,* D.D.C.1981, 526 F.Supp. 97 (jury could conclude that risk of failure of tubal ligation was material where physician knew that plaintiff had suffered severe gynecological problems and could die from a future pregnancy).

6. One physician testified that vasectomy patients are often under the impression that vasectomy is an infallible method of birth control.

physician testified that he informs his patients of recanalization partly to provide them with the option of decreasing the risk of conception by having annual sperm counts or by continuing to use alternative birth control methods for a period beyond the initial postoperative zero sperm count.[7] Another physician indicated that apart from the normal risks of infection, bleeding and surgical error associated with all operations, recanalization is the only real risk of vasectomy. Additionally, the parties' experts were all in agreement that the risk of recanalization is common knowledge in the medical community.

Taking into consideration such factors as the widespread practice among physicians of disclosing the risk of recanalization, the elective nature of vasectomy, and postoperative measures available to the patient to reduce that risk, it does not seem unduly burdensome to require physicians to disclose one of the only risks associated with vasectomy and one well known to the medical community. The objective of the *Harnish* standard is to reach an acceptable compromise between a patient's right to information and what society can reasonably expect of physicians in this regard. *Harnish, supra,* 387 Mass. at 155, 439 N.E.2d 240. The materiality determination is, in essence, a means of finding that middle ground. However, when application of the rule would operate to discourage disclosure of information which is now routinely disclosed and to defeat a reasonable patient's expectations, its limitations must be recognized. Therefore, rather than resolving the materiality question in accordance with the *Harnish* formula and reaching a result contrary to the rule's original objective, the court does not rest its deci-

sion on whether recanalization is a material risk of a vasectomy operation.

**B. Causation:**

"An unrevealed risk that should have been made known must materialize, for otherwise the omission, however unpardonable, is legally without consequence." *Harnish, supra,* at 157–158, 439 N.E.2d 240. As discussed *ante,* Mr. Ostergard was not informed of the risk of recanalization and this particular risk materialized causing him to become fertile again. However, and crucially, this does not end the causation inquiry. A plaintiff must also show that had the proper information been provided, neither he nor a reasonable person in similar circumstances would have undergone the procedure. *Id.,* at 158, 439 N.E.2d 240. In the instant action, even assuming that the risk of recanalization was material, plaintiffs have not proved by a preponderance of the evidence that had the risk of recanalization been disclosed, a reasonable person in similar circumstances would have declined the vasectomy.[8]

The undisputed facts show that the plaintiffs initially consulted a Public Health Service doctor about obtaining a tubal ligation. Mrs. Ostergard was dissatisfied with oral contraceptives and wanted a permanent method of birth control. Dr. McCormack advised her that vasectomy was a simpler and safer procedure than tubal ligation. Plaintiffs testified that they discussed the two alternatives and chose vasectomy. They further stated that their primary objective was permanent sterility. Although plaintiffs were not asked the specific question during the trial, the evidence compels the inference that reasonable persons in the plaintiffs' position would have chosen

---

7. Of course, for purposes of informed consent law, the significance of a particular risk is measured only in terms of its role in the patient's initial decision to consent to the procedure. However, disclosure of the risk of failure and the steps a patient can take to reduce that risk once the operation is performed may have significance in the decision-making process to the extent that that information detracts from the relative advantages of vasectomy over other forms of birth control.

8. Mr. Ostergard testified that he would not have had a vasectomy had he known about the possibility of recanalization. While his testimony is relevant on the issue of causation, it is not controlling. The *Harnish* standard calls for an objective determination on the theory that a patient's testimony as to what he would have done "represents little more than a guess, perhaps tinged by the circumstances that the uncommunicated hazard has in fact materialized." *Canterbury v. Spence,* D.C.Cir.1972, 464 F.2d 772, 790.

that procedure which would best enable them to achieve that objective.

Evidence regarding birth control methods established that in terms of effectiveness and safety, vasectomy is the best method available today. The failure rates, i.e., unwanted pregnancies, and incidences of complications associated with tubal ligation and oral contraceptives are significantly higher than those for vasectomy. Such evidence strongly suggests that a reasonable person seeking the most effective and safest form of birth control would have chosen vasectomy. Furthermore, it is unlikely that that choice would have been affected by disclosure of a 1 in 1,000 risk that the procedure would fail to sterilize him permanently. A reasonable person desiring the safest, most effective method would not be likely, upon learning of the small risk of failure, to abandon vasectomy in favor of another method with a higher rate of failure and complications.

This conclusion is supported by the testimony of the parties' experts regarding their own experiences with patients. Dr. Siroky, Dr. Filoso and even plaintiff's expert, Dr. Spellman, stated that their patients still choose vasectomy after being fully informed of the risk of recanalization. In fact, none of the doctors could recall a single patient declining a vasectomy because of the possibility of recanalization. Such evidence, although not conclusive, weakens considerably plaintiffs' contention that had the proper information been given, neither they nor reasonable persons in similar circumstances would have consented to the operation. Rather, it shows quite the opposite—patients would not and do not decline vasectomy when informed of the risk of recanalization.

Lastly, the court does not credit plaintiffs' testimony that they would have chosen hysterectomy as their birth control method had they known that vasectomy could not completely eliminate the risk of pregnancy. Rather, the evidence indicated that hysterectomy is a drastic procedure with a significant risk of serious complications or death. According to the testimony of defendant's expert, Dr. Stubblefield, which we adopt in this respect, hysterectomy is not considered an acceptable method of birth control in an otherwise healthy woman. In our opinion, the evidence disproves that a reasonable person in circumstances similar to plaintiffs', when informed of the remote risk of recanalization associated with the safest, most effective birth control method, would choose instead a method involving major surgery and the risk of serious complications or death.

## III. CONCLUSION:

Plaintiffs have not shown by a preponderance of the evidence that disclosure by the defendant of the risk of recanalization would have caused a reasonable person in plaintiffs' circumstances to decline the vasectomy. Accordingly, judgment shall be entered for defendant.

EXHIBIT 1

*get copies run off*

| | |
|---|---|
| **EXHIBIT**<br>No. 1fcID<br>404/86 Sb<br>**MEDICAL RECORD** | **REQUEST FOR ADMINISTRATION OF ANESTHESIA**<br>**AND FOR PERFORMANCE OF OPERATIONS AND OTHER PROCEDURES** |

**A. IDENTIFICATION**

**1. OPERATION OR PROCEDURE**

**VASECTOMY**

**B. STATEMENT OF REQUEST**

**1.** The nature and purpose of the operation or procedure, possible alternative methods of treatment, the risks involved, and the possibility of complications have been fully explained to me. I acknowledge that no guarantees have been made to me concerning the results of the operation or procedure. I understand the nature of the operation or procedure to be_____ *(Describe nature in layman's language)*

Surgical cutting of the tube that carries the sperm from the testicle to the outside. Other forms of contraception MUST be used to prevent pregnancy until a test on the sperm fluid shows no more sperm. This will take not less than six (6) weeks after the operation.

A vasectomy results in sterility (the inability to make a female pregnant), and this operation should be considered NOT REVERSIBLE.

Complications may include bleeding and infection.

**2.** I request the performance of the above-named operation or procedure and of such additional operations or procedures as are found to be necessary or desirable, in the judgment of the professional staff of the below-named medical facility, during the course of the above-named operation or procedure.

**3.** I request the administration of such anesthesia as may be considered necessary or advisable in the judgment of the professional staff of the below-named medical facility.

**4.** Exceptions to surgery or anesthesia, if any, are:_____ *(If "none", so state)*

**5.** I request the disposal by authorities of the below-named medical facility of any tissues or parts which it may be necessary to remove.

**6.** I understand that photographs and movies may be taken of this operation, and that they may be viewed by various personnel undergoing training or indoctrination at this or other facilities. I consent to the taking of such pictures and observation of the operation by authorized personnel, subject to the following conditions:

    **a.** The name of the patient and his/her family is not used to identify said pictures.

    **b.** Said pictures be used only for purposes of medical study or research.

*(Cross out any parts above which are not appropriate)*

**C. SIGNATURES**     *(Appropriate items in Parts A and B must be completed before signing)*

**1. COUNSELING PHYSICIAN:** I have counseled this patient as to the nature of the proposed procedure(s), attendant risks involved, and expected results, as described above.

X _____     _____
(Signature of Spouse) (Date)     (Signature of Counseling Physician)

**2. PATIENT:** I understand the nature of the proposed procedure(s), attendant risks involved, and expected results, as described above, and hereby request such procedure(s) be performed.

_____     X _____
(Signature of Witness, excluding members of operating team)     (Signature of Patient)    (Date & Time)

**3. SPONSOR OR GUARDIAN:** (When patient is a minor or unable to give consent) I,_____ sponsor/guardian of_____ understand the nature of the proposed procedure(s), attendant risks involved, and expected results, as described above, and hereby request such procedure(s) be performed.

_____     _____
(Signature of Witness, excluding members of operating team)     (Signature of Sponsor/Legal Guardian)    (Date & Time)

| **PATIENT'S IDENTIFICATION** *(For typed or written entries give: Name—last, first, middle; grade; date; hospital or medical facility)* | **REGISTER NO.** | **WARD NO.** |
|---|---|---|
| OSTERGARD ROBERT L<br>USAER N JUN 50 38<br>PHS HOSP BOSTON MA<br><br>USPHS HOSPITAL<br>77 WARREN STREET<br>BRIGHTON, MASS. 02135 | STANDARD FORM 522<br>January 1973 (Rev.)<br>General Services Administration &<br>Interagency Comm. on Medical Records<br>FPMR 101–11.809–3<br>522–107 | 5 |

☆ U.S. G.P.O. 1973-509-393