Walter B. KISSINGER,
Plaintiff, Appellee,

v.

Robert H. LOFGREN, et al.,
Defendant, Appellee.

John P. Remensnyder, Defendant, Appellant.

Walter B. KISSINGER,
Plaintiff, Appellee,

v.

Robert H. LOFGREN,
Defendant, Appellant.

Nos. 86–1372, 86–1402 and 86–1403.

United States Court of Appeals,
First Circuit.

Heard Oct. 6, 1987.

Decided Jan. 5, 1988.

Raymond J. Kenney, Jr., with whom Linda E. Neary and Martin, Magnuson, McCarthy & Kenney, Boston, Mass., were on brief for appellant John P. Remensnyder.

Joseph P. Musacchio with whom Robert P. Powers and Melick & Porter, Boston, Mass., were on brief for appellant Robert H. Lofgren.

* Of the Fifth Circuit, sitting by designation.

Joel A. Kozol with whom Robert D. Kozol, Jane P. Morse and Friedman & Atherton, Boston, Mass., were on brief for plaintiff, appellee.

Before COFFIN, Circuit Judge, BROWN,* Senior Circuit Judge, and TORRUELLA, Circuit Judge.

TORRUELLA, Circuit Judge.

Walter B. Kissinger suffered from severe and chronic pain following an operation performed by Dr. Robert H. Lofgren and assisted by Dr. John P. Remensnyder. Kissinger brought suit against the doctors alleging negligence and lack of informed consent under Massachusetts tort law. The jury found that the defendants had not negligently carried out the operation. However, the jury concluded that the doctors had failed to advise Kissinger beforehand of all significant risks and consequences of surgery and awarded $275,000 in damages.

The defendants have appealed from the court's denial of their motions for a directed verdict, judgment notwithstanding the verdict and for a new trial. Both defendants attack the sufficiency of the evidence with respect to the informed consent count. While Remensnyder also challenges the court's instructions relative to that count, Lofgren argues that the district court erred in excluding certain evidence for lack of authentication. We affirm the decision of the court below.

## I. *Background*

Viewing the evidence in the light most favorable to the plaintiff and drawing all reasonable inferences in his favor, *Payton v. Abbott Labs.*, 780 F.2d 147, 156 (1st Cir.1985), the record establishes the following. In the early 1970's, Kissinger began experiencing mild discomfort in his upper left gum. Following unsuccessful dental treatments, Kissinger sought the advice of Drs. Selfe and Som, two New York based otolaryngologists ("ENT" specialists), who diagnosed in 1978 a benign tumor covering

a significant portion of his sinus. Both doctors recommended a "Caldwell-Luc" surgical procedure to remove the tumor. These doctors also explained to Kissinger that the "only tricky part of the operation" was to avoid damage to a nerve in the sinus area.

Kissinger obtained a third opinion from Dr. Gerald Austin, Chief of Surgery at Massachusetts General Hospital (Mass. General). Dr. Austin concurred in the previous diagnoses of Drs. Selfe and Som, and discussed with Kissinger the possibility of malignancy. Dr. Austin, however, did not mention the possibility of risk of injury to a nerve from the Caldwell-Luc operation. Dr. Austin arranged to have the surgery performed by the defendant Remensnyder, Chief of Plastic and Reconstructive surgery at Mass. General, and the one who had admitted Kissinger into the hospital. Remensnyder repeated to Kissinger that the "delicate part" of the operation was to avoid injuring the "infraorbital nerve." Subsequently, Remensnyder, who had performed Caldwell-Luc operations in the past, requested the more experienced Doctor Lofgren, an ENT specialist from the Massachusetts Eye and Ear Infirmary, to perform this operation. Lofgren recommended the operation to Kissinger because it had a "reasonable chance of relieving his pain" and removing the tumor. The only surgical risk mentioned by Lofgren was the possibility of temporary numbness.

On April 7, 1978, Lofgren, with the assistance of Remensnyder, performed the Caldwell-Luc surgery. A day after surgery, Kissinger experienced pain, and "complained bitterly of an area of numbness which corresponds to the left-infra/orbital nerve distribution." Kissinger testified that he continues to suffer from chronic, excruciating pain.

Uncontroverted testimony shows that the doctors neither informed Kissinger prior to surgery about the possibility that chronic pain could result from an injury to the nerve from the Caldwell-Luc operation, nor did they tell him about an alternative surgical procedure, intranasal anthostomy, which could have lessened the risk of that injury occurring.

## II. *Discussion*

### A. *The Charge to the Jury and the Sufficiency of the Evidence*

The doctrine of informed consent in Massachusetts requires a plaintiff to establish 1) the existence and breach of a duty owed by the defendant to inform about significant risks, consequences, and options of a medical treatment, and 2) that breach of this duty caused harm to the plaintiff. *Precourt v. Frederick*, 395 Mass. 689, 481 N.E.2d 1144, 1145 (Mass.1985); *Harnish v. Children's Hosp. Med. Center*, 387 Mass. 152, 439 N.E.2d 240, 242, 245 (Mass.1982).

### 1. *The duty of care and its breach*

The four principal components of the duty of care element are that 1) there exists a "sufficiently close" doctor-patient relationship, 2) the information subject to disclosure is known or reasonably should have been known by the doctors, 3) the information is such that the doctors should reasonably recognize that it would be material to the plaintiff's decision whether to forego treatment, and 4) the doctors failed to disclose the material information. *Halley v. Birbiglia*, 390 Mass. 540, 458 N.E.2d 710, 715 (Mass.1983).

■ We find sufficient evidence for the jury to have found that the doctor-patient relationship was "sufficiently close" to impose a duty to inform as to both defendants. The fact that Dr. Lofgren was the surgeon in charge of the operation is alone enough to make the relationship sufficiently close. *See Harnish*, 439 N.E.2d at 244. Dr. Remensnyder also had a similar duty of care because he admitted Kissinger into Mass. General, advised the patient prior to the operation, and assisted Lofgren during surgery. *See Halley*, 458 N.E.2d at 715.

■ Secondly, expert testimony sufficiently established that the doctors knew or reasonably should have known that chronic pain was one consequence of a severe injury to the infraorbital nerve occurring during the Caldwell-Luc operation. Dr. Grego-

ry F. O'Brien, an otolaryngologist, testified for the plaintiff that the risk of injury to the nerve is known or reasonably should be known by every physician who performs that kind of operation. Dr. Remensnyder himself admitted that such an injury is a "known risk" of the Caldwell-Luc procedure. Dr. O'Brien also opined that chronic pain is a consequence of a severe injury to the nerve that should be communicated to the patient before surgery. The additional fact that both defendants had prior experience with the Caldwell-Luc procedure lends support to a finding that they knew or reasonably should have known of its risks and consequences.

■ The third component of the duty of care analysis, the materiality of the information, lies at the crux of this case. Dr. Lofgren complains that the evidence was insufficient to go to the jury on this question. Whether the evidence was legally sufficient to sustain the verdict is determined by the meaning of "materiality" under Massachusetts law. According to the Massachusetts Supreme Judicial Court, information is "material" when a physician reasonably should recognize it as necessary for his patient to make an informed decision whether to forego proposed treatment. *Harnish*, 439 N.E.2d at 743. Certain risks inherent in any operation, such as infections, should reasonably be known to every patient and need not be disclosed. *Id.* Other risks which are "possible," but remote or unforeseeable due to their "negligible" probability of occurrence, are immaterial as a matter of law. *See Precourt*, 481 N.E.2d at 1148–49.

■ In *Precourt*, there was an absence of expert testimony as to whether a degenerative bone disorder (aseptic necrosis) was a foreseeable result of a course of treatment with the drug "Prednisone." Expert testimony that the risk of contracting aseptic necrosis was "high" if the medication was taken in "high" doses, during a "long

course of therapy," was deemed speculative by the Court. *Id.* at 1149. Despite evidence to the effect that aseptic necrosis was one of the "most prominent" musculoskeletal complications of Prednisone, it was inappropriate to submit the materiality issue to the jury in the absence of expert testimony as to the actual likelihood of that risk occurring. *Precourt* did not consider, however, whether the materiality analysis requires an expert to assess the risk of occurrence in terms of numerical data and we refuse to adopt such a rule.[1]

In this case the jury had evidence from which to find the likelihood of occurrence of the harm. There was ample evidence that the risk of injury to the nerve was substantial, "a known risk," and one that requires warning the patient.[2] It also was uncontroverted that the injury could produce ill effects ranging from numbness to severe pain. In addition there was evidence that the risk of severe pain was not remote, that an otolaryngologist had seen instances of severe injury in his practice, and that it happened often enough that a facial pain expert treated "many dozens of patients" who were in Kissinger's same shoes. This kind of testimony is much less tenuous than the statement that a "long" course of treatment, with "high" dosages, creates a "high" risk of injury, as in *Precourt*. In light of the expert testimony that injury to the nerve is not a freak accident of the Caldwell-Luc procedure, "it became the jury's responsibility to decide whether that peril was of sufficient magnitude to bring the disclosure duty into play." *Canterbury v. Spence*, 464 F.2d 772, 794 (D.C. Cir.), *cert. denied*, 409 U.S. 1064, 93 S.Ct. 560, 34 L.Ed.2d 518 (1972).

■ Dr. Remensnyder argues that the charge to the jury with regard to the materiality issue was erroneous. The court, tracking the language in *Precourt, supra*, instructed the jury:

1. To accept a rule of that nature would be to glorify unduly the epidemiological statistician's art, and to foreclose meritorious suits in areas where precise statistics are yet unavailable.

2. This, of course, was not in issue, because Kissinger admitted he had been warned of possible damage to the nerve. His claim, however, was that he had only been told that temporary numbness could result, not chronic pain.

The materiality of information about a potential injury is a function not only of the severity of the injury but also of the likelihood that it will occur. Regardless of the severity of a potential injury, if the probability that the injury will occur is so small as to be practically non-existent, then the possibility of that injury occurring cannot be considered a material factor in a rational assessment of whether to engage in the activity that exposes one to the potential injury.

A severe consequence ordinarily of interest to the patient would not require disclosure if the chance of the consequence occurring was so remote as to be negligible. Likewise, no disclosure would be required of a very minor consequence even though the probability of occurrence was high.

The obligation to give adequate information does not require the disclosure of all risks of a proposed therapy. The remotely possible risks of a proposed treatment may be also without limit, and a physician is not required to inform a patient of remote risks.

\* \* \*

[T]here is an obligation to inform of risks unless they are so remote as to be negligible. That is, if there is a negligible risk or remote risk, there is no obligation.

\* \* \*

If the chances of something happening are very remote or very minor or inconsequential, the physician does not have to tell the patient, but if there is a real chance of a risk occurring, and if it is of a serious nature, then there is an obligation.

Remensnyder argues, for the first time on appeal, that simply because a risk is *not* remote does not necessarily mean the information is material and, hence, subject to disclosure. Appellant highlights the fourth paragraph quoted above to demonstrate that the instruction was too one-sided in its description of materiality. He argues that the instruction should have made some ref-erence to what a reasonable person would wish to know. However, appellant ignores his failure specifically to object below on that ground. *See Elwood v. Pina,* 815 F.2d 173, 175–76 (1st Cir.1987). The objection has been waived, and our review is limited to plain error analysis. Fed.R.Civ. P. 51.

■ Read as a whole, the jury instruction adverts to the need to balance the likelihood of occurrence of the harm against the seriousness of the possible harm in order to determine whether this risk is a material factor in "a rational assessment of whether to engage in the activity ..." *Ante.* We find this instruction more than adequate, under a plain error standard, to warn the jury that they must decide, after weighing likelihood against seriousness of the risk, whether the information at issue could reasonably impinge on Kissinger's decision-making process. *See Precourt, supra,* 481 N.E.2d at 1148–49.

■ The defendants also contend that they could reasonably have assumed that Kissinger already knew the risks and that therefore the doctors had no duty to disclose them. Under the facts of this case, we cannot agree. First, the defendants have produced no facts from which they reasonably could have assumed Kissinger's knowledge of the risks and consequences. Second, the record does not suggest that chronic pain, like an infection in any operation, is an obvious consequence of nerve injury. We therefore see no reason to hold that the jury was required to find that the doctors reasonably assumed knowledge of the material information.

Finally, as to the last component of the duty of care, there is no suggestion that the doctors actually informed Kissinger of this material information.

### 2. *Causation*

A breach of an obligation to disclose is not actionable if 1) the undisclosed risk never materialized or 2) a reasonable person in the plaintiff's position would have consented to the treatment in spite of

knowing the risk and its possible consequences. *Harnish*, 439 N.E.2d at 244.

■ We agree with Kissinger that the evidence supported a finding that the undisclosed risk materialized. Both defendants admitted at trial that the nerve may have been injured from Lofgren's scraping of a bone to remove the tumor, or from Remensnyder's use of a retractor during the operation. The testimony of plaintiff's experts, discussed above, also would allow a jury to conclude that the risk of nerve injury and the consequence of chronic pain materialized. While there is conflicting evidence suggesting that Kissinger suffers from an "atypical facial" pain, unrelated to nerve damage caused by the Caldwell-Luc procedure, the weight of the evidence and the credibility of the witnesses were strictly for the jury to decide. *See Hubbard v. Faros Fisheries*, 626 F.2d 196, 199 (1st Cir.1980).

Defendant Remensnyder has objected to the following charge with regard to the second element of causation:

> ... had he been told [of the risks, consequences and options] ... would he have decided against it ... and in so deciding would he have been acting reasonably.

While this language differs to some extent from that in *Harnish, supra*, the court went on to quote the proper standard of causation as set forth in *Harnish*, almost word for word. Whatever minor differences there may have been initially, therefore, were subsequently corrected.

■ As to the sufficiency of the evidence, Kissinger testified that he would not have consented to the procedure had he known the extent of the suffering he was risking. Although Kissinger's subjective views are alone insufficient, a jury could conclude that a person suffering from mild discomfort for about eight years, and who has been advised to undergo a treatment that could alleviate his pain, would refuse it if he was told that the possibility of constant, excruciating pain was greater with the treatment than without it.

For the reasons discussed above, we hold that the court properly denied defendants' motions.

### B. *The Authentication Issue*

Defendant Lofgren sought to introduce at trial what purported to be the records of Dr. Som, the New York-based ENT specialist. The records were introduced on the issue of causation to demonstrate that Kissinger had complained of "constant pain" to Dr. Som prior to the Caldwell-Luc operation. Ruling upon Kissinger's objection, the court found that Lofgren had not established a sufficient foundation for authentication. Fed.R.Evid. 901.

Both parties agree that the exclusion of evidence is entrusted to the sound discretion of the court and will not be disturbed absent an abuse of discretion. *Harrington v. United States*, 504 F.2d 1306, 1313 (1st Cir.1974). If there is "evidence sufficient to support a finding" that the evidence is what the proponent claims it to be, the preliminary threshold of authentication has been satisfied and the jury should then be permitted to consider its weight or credibility. 5 J. Weinstein & M. Berger, *Weinstein's Evidence*, ¶ 901(a)([01]) at 901–15 to –16 (1983).

■ The records in this case consisted of a three-page document containing a list of entries of medical visits by Kissinger from March 8 or 9, 1978 through July 3, 1980. The records do not bear the official letterhead of Dr. Som nor his signature. The evidence that they are genuine is meager: The entry of March 8, 1978 states that Kissinger complained of "constant pain" and indicates a referral to another doctor for further treatment. Kissinger's testimony at trial corroborated the fact that he visited Dr. Som on March 8, 1978 and was referred to another physician. While the documents perhaps could have been admitted, in any event, we do not think it was an abuse of discretion not to do so.

■ Even if the court abused its discretion in excluding the records, the error was harmless. Fed.R.Evid. 103(a). Lofgren was able to introduce the contents of the records through cross-examinations of Kis-

singer and Dr. O'Brien. Our conclusion is bolstered by the strength of the evidence supporting the jury's verdict.

*Affirmed.*