JOSEPH R. FORLANO[1] vs. ARTHUR L. HUGHES & others.[2]

Suffolk. September 10, 1984. — December 13, 1984.

Present: HENNESSEY, C.J., LIACOS, NOLAN, LYNCH, & O'CONNOR, JJ.

*Doctor*, Duty to disclose risks. *Negligence*, Medical malpractice, Proximate cause. *Contract*, With doctor, With hospital. *Medical Malpractice*, Consent to medical treatment. *Practice, Civil*, Judgment notwithstanding verdict.

In an action against three physicians and a medical clinic alleging that the doctors negligently treated the plaintiff when he went to them for a myelography, and that he suffers severe, incapacitating headaches as a result of radiopaque dye used in the procedure entering his skull, the judge erred in denying the defendants' motions for a directed verdict and for judgment notwithstanding the verdict where the plaintiff failed to produce sufficient evidence to show that it was more probable that the dye entered his skull after the procedure, rather than during it, and where the expert testimony offered by the plaintiff tended to show negligence only if the dye could be found to have entered his skull after the procedure was concluded. [506-508]

A patient was not entitled to recovery against a physician and a medical clinic on a claim alleging breach of a contract to provide a particular neurosurgeon to perform a myelography, where the patient offered no evidence tending to prove that if that neurosurgeon had performed the procedure, the alleged harm to the patient would not have occurred. [508-509]

On a patient's claim against two physicians alleging that he suffered a battery because he had not consented to the substitution of one physician for another who was to perform a myelography on him, the judge erred in denying the defendants' motions for a directed verdict and for judgment notwithstanding the verdict where the plaintiff testified that he knew about the risks of myelography and that he had consented to the procedure, and where there was no evidence that the plaintiff requested that the procedure be stayed in the absence of the physician he had requested. [509-510]

[1] Helen A. Forlano was named as a plaintiff in the second amended complaint. She has not appealed the judgment against her on her loss of consortium claims. Hence, we will discuss only the plaintiff Joseph R. Forlano's claims.

[2] Dr. Stephen R. Freidberg, Lahey Clinic Foundation, Inc. (Lahey Clinic), and Dr. Mete Saveren.

CIVIL ACTION commenced in the Superior Court on November 4, 1977.

The case was tried before *Paul G. Garrity, J.*

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*Stephen S. Young (James D. Smeallie* with him) for the plaintiff.

*David M. Gould* for Lahey Clinic Foundation, Inc., & others.

*Charles P. Reidy, III,* for Mete Saveren.

LIACOS, J. Joseph Forlano brought this action in the Superior Court in Suffolk County. The complaint has many counts. In main part, the complaint alleges that the defendant doctors negligently treated Forlano when he went to them for a myelography, and that he suffers severe, incapacitating headaches as a result. Forlano brought negligence, deceit, breach of contract, and battery claims against the defendant Dr. Hughes; negligence and battery claims against the defendant Dr. Saveren; a negligence claim against the defendant Dr. Freidberg; and negligence and breach of contract claims against the defendant Lahey Clinic.[3] The trial judge submitted the case to the jury on special questions.[4] The jury returned a verdict for the plaintiff against all the defendants on all counts. The jury awarded Joseph Forlano $170,817 in damages against the defendants, Drs. Hughes, Saveren, Freidberg, and Lahey Clinic.

Defendants Drs. Hughes, Saveren, Freidberg, and the Lahey Clinic appealed on numerous grounds, claiming principally that the trial judge erred in denying their motions for a directed verdict and for judgment notwithstanding the verdict. The Appeals Court held, in a summary order and an unpublished memorandum, that there was insufficient evidence on the issue of causation to submit the case to the jury on any of the counts,

---

[3] The plaintiff also named the New England Deaconess Hospital as a defendant. However, the trial judge granted Deaconess's motion for a directed verdict at the close of the plaintiff's case, and Forlano does not appeal this decision.

[4] The trial judge did not submit the deceit claim against Dr. Hughes to the jury; he granted Dr. Hughes's motion for a directed verdict on that claim. Forlano has not appealed that decision.

and ordered the entry of judgment for the defendants. *Forlano* v. *Lahey Clinic Foundation, Inc.*, 17 Mass. App. Ct. 1105 (1983). We granted the plaintiff's application for further appellate review. We order the entry of judgment for the defendants on all counts.

In reviewing the denial of the motions for directed verdict and for judgment notwithstanding the verdict, the same standard applies. The standard is "whether 'anywhere in the evidence, from whatever source derived, any combination of circumstances could be found from which a reasonable inference could be drawn in favor of the plaintiff.' *Poirier* v. *Plymouth*, 374 Mass. 206, 212 (1978)." *Miles* v. *Edward O. Tabor, M.D., Inc.*, 387 Mass. 783, 786 (1982), quoting *Abraham* v. *Woburn*, 383 Mass. 724, 727-728 (1981). In applying this standard, we examine the evidence in the light most favorable to the plaintiff. See, e.g., *LaClair* v. *Silberline Mfg. Co.*, 379 Mass. 21, 23 (1979).

There was evidence as to the following. Forlano had a history of serious back problems. After three unsuccessful back operations, he was referred by his doctor to the Lahey Clinic for testing and evaluation. On his first visit he was examined by the defendant Dr. Hughes, among others. Dr. Hughes requested that Forlano return for a second visit, which he did. During that second visit, Dr. Hughes recommended that Forlano undergo a diagnostic procedure known as myelography. Forlano had heard of the procedure and was uneasy about it. He was afraid that the doctors would be unable to remove the dye which is injected into the spinal column during the procedure. He told Dr. Hughes that if he were to have it done, he would want "the best neurosurgeon" in the clinic to perform it. He did not immediately consent to the procedure. He returned to his home in Connecticut, discussed the procedure with his Connecticut physician and his wife, and then decided to undergo the procedure.

He returned to Boston on November 6, 1974, for the myelography. That day he saw Dr. Hughes, who assured him that the "best neurosurgeon," the defendant Dr. Freidberg, would perform the procedure. With that assurance, he checked into the New England Deaconess Hospital.

He was sedated the next morning and wheeled into the operating room. He was conscious throughout the procedure. In the operating room, he asked which of the three people there was Dr. Freidberg. The defendant Dr. Saveren said that Dr. Freidberg was not present, but that he, Dr. Saveren, would "prepare" him for the procedure. Dr. Saveren then proceeded to perform the entire procedure.

In performing myelography, the patient is strapped onto a moveable table. A physician inserts a needle into the spinal canal, withdraws spinal fluid, and then injects a radiopaque dye, in this case "Pantopaque," into the spinal canal. The table is manipulated so that the dye runs up and down the patient's spine. A radiologist takes pictures, or "myelograms," of the dye in the patient's spinal column.[5]

Dr. Saveren injected the needle, withdrew the spinal fluid, and injected the Pantopaque. A pillow was inserted under Forlano's head. His head was held up whenever the table was tilted in such a way that his head might be lower than the rest of his body. When Dr. Saveren attempted to remove the dye, problems arose. Forlano was extremely anxious. He experienced great pain. Dr. Saveren paged Dr. Freidberg, but Dr. Freidberg never responded. Dr. Saveren removed the needle with no further attempts to remove the dye. Forlano was wheeled back to his hospital room.

Dr. Hughes visited Forlano in his hospital room that afternoon and told him not to worry about the dye; he indicated that the dye could be removed at a later date if necessary. Forlano left the hospital the next day. He never saw Dr. Saveren after the myelography, and he never met Dr. Freidberg. The dye has never been removed.

Approximately six months after the myelography, Forlano began experiencing severe, throbbing, bursting headaches unlike any others he had had. There was evidence that the cause of his headaches is the presence of the dye in his skull. The dye

---

[5] At trial, a "Dr. M.A. Kellett" was referred to as the radiologist. Neither he nor the third person assisting in the myelography was named a party or testified as a witness.

now cannot be removed from his skull. It absorbs into the body very slowly. His incapacitating headaches will be permanent.

*Negligence claims against Drs. Hughes, Freidberg, and Saveren, and Lahey Clinic.* The plaintiff argued to the jury that the negligent acts of the defendants resulted in the presence of Pantopaque in his skull, and that the dye trapped in his skull causes his incapacitating headaches. On appeal, the defendants argue that the judge should have allowed their motions for a directed verdict, or, alternatively, their posttrial motions for judgment notwithstanding the verdict. They claim that the plaintiff presented insufficient evidence on the issue of negligence and of causation for the negligence counts to be submitted to the jury. Specifically, they assert that the plaintiff presented insufficient evidence on the question how any negligent acts or omissions made by the defendants caused the Pantopaque to enter his skull. After a careful examination of the trial transcript, we are constrained to agree with the defendants.

Dr. Hughes testified that an X-ray taken before the myelography did not reveal the presence of any foreign material in Forlano's skull. The plaintiff's expert witness, Dr. James Merikangas, testified that Forlano had dye in his head when he treated him several years after the myelography.[6] However, the plaintiff did not introduce sufficient evidence on when — during the procedure or after the procedure — the dye entered his skull.[7] He did not, moreover, present sufficient evidence for the jury to conclude that if the dye entered during the myelography, it did so as a result of the defendants' negligence.

The plaintiff argues that the jury could infer negligence from the evidence that the dye was not intended to enter Forlano's

[6] Dr. Merikangas also testified that the presence of Pantopaque in Forlano's head causes his debilitating headaches.

[7] The plaintiff concedes in his brief that "it cannot be determined exactly when the dye entered Forlano's head." The plaintiff also states in his supplemental brief that "although the jury would have been warranted in finding that the dye entered Forlano's cranial cavity during the myelography, it also would have been warranted in finding that it did so after the procedure or at both times."

head, that it is standard procedure for the patient's head to be held up whenever the operating table is tilted downwards, and that Forlano's head was so held. This alone is insufficient.

"It is only in exceptional cases that a jury instructed by common knowledge and experience may without the aid of expert medical opinion determine whether the conduct of a physician toward a patient is violative of the special duty which the law imposes as a consequence of this particular relationship." *Haggerty* v. *McCarthy*, 344 Mass. 136, 139 (1962), quoting *Bouffard* v. *Canby*, 292 Mass. 305, 309 (1935). Cf. *Civitarese* v. *Gorney*, 358 Mass. 652, 656 (1971); *Glicklich* v. *Spievack*, 16 Mass. App. Ct. 488, 492 (1983).

We note, also, that, when asked in cross-examination whether the dye could enter the skull during the myelography without anyone's departing from acceptable medical practice, the plaintiff's expert witness answered: "Well, that's a difficult question. The best practice would be that you wouldn't let it happen, but it does happen. . . . There are unfortunate accidents that are not malicious, but it can happen . . . ."

Thus, the plaintiff presented two possible ways for the dye to have entered his head, but only one of these ways — after the procedure — could have been due to the defendants' negligence. The plaintiff did not present sufficient evidence for the jury to decide which of the two possible ways he suffered his injury was more probable than not.[8] "While the plaintiff is not ·bound to exclude every other possibility of cause for his injury except that of the negligence of the defendant, he is required to show by evidence a greater likelihood that it came from an act of negligence for which the defendant is responsible than from a cause for which the defendant is not liable." *Alholm*

---

[8] The hospital records of the New England Deaconess Hospital were devoid of any indication that there was dye in Forlano's head at any point. Moreover, counsel for defendant New England Deaconess Hospital engaged the plaintiff's expert witness in the following dialogue:

    THE WITNESS:    "It could have gone in at any time after the myelography."
    DEFENSE COUNSEL:    "At any time?"
    THE WITNESS:    "During or after."

v. *Wareham,* 371 Mass. 621, 626-627 (1976), quoting *Bigwood* v. *Boston & N. St. Ry.,* 209 Mass. 345, 348 (1911). See Restatement (Second) of Torts § 433B comment b (1977). See also *Carey* v. *General Motors Corp.,* 377 Mass. 736, 740 (1979); *Glicklich* v. *Spievack, supra.*

The plaintiff submitted evidence through the testimony of Dr. Merikangas that, if the dye entered his skull after the procedure, it did so as a result of the defendants' negligence.[9] As this was insufficient to meet plaintiff's burden, the trial judge erred in denying the defendants' motions for a directed verdict and for judgment notwithstanding the verdict on the negligence claims.[10]

*Breach of contract claims against Dr. Hughes and Lahey Clinic.* The jury were warranted in finding that Dr. Hughes contracted with Forlano to provide Dr. Freidberg as the neurosurgeon to perform the myelography. Cf. *Sullivan* v. *O'Connor,* 363 Mass. 579 (1973) (patient may sue doctor for breach of promise to produce a specific medical result). However, this finding is to no avail because the jury were not warranted in finding that any harm flowed from the breach of

---

[9] Dr. Merikangas testified that if the dye has not entered during the procedure, a physician should make a second attempt to remove the dye from the spinal canal by reinserting the needle or by waiting a day and trying again. He also testified that if the dye has not entered the skull during the procedure, the physicians should instruct the patient to keep his head upright until they make a second attempt to remove the dye. The reason for keeping the head upright is to prevent the dye from entering the head. Apparently, once the dye enters the head, it cannot be removed. There was no expert testimony that, if the dye had gotten into Forlano's skull during the procedure, it could have been removed after the procedure. Further, assuming that the dye was not yet in the plaintiff's skull, but was only in his spinal column, Dr. Merikangas testified only that it might "possibly" have been removed. This was insufficient to meet plaintiff's burden. *King's Case,* 352 Mass. 488, 491 (1967). *Berardi* v. *Menicks,* 340 Mass. 396, 402 (1960). *Glicklich* v. *Spievack, supra* at 492-493.

[10] Because the plaintiff failed to present sufficient evidence to prove that the dye entered his head as a result of any negligence by Dr. Saveren, the doctor who performed the myelography, his negligence claims against the other defendants also fail, as they are similarly speculative. Finally, Forlano based his negligence claim against Lahey Clinic on a "respondeat superior" theory, and, hence, that claim falls with the others. Therefore, the motions for directed verdict and for judgment notwithstanding the verdict on the negligence claims against all the defendants should have been granted.

the contract.[11] As discussed above, the plaintiff presented insufficient evidence to prove that any acts or omissions by Dr. Saveren resulted in the plaintiff's injury. The plaintiff offered no evidence to prove that, if Dr. Freidberg had performed the myelography, the harm would not have resulted. See *Alexandridis* v. *Jewett*, 388 F.2d 829, 833 (1st Cir. 1968) (plaintiff can recover for breach of contract if physician who was to have performed the surgery possessed "added skill" which "would have avoided the injury").

As with the negligence claim against Lahey Clinic, the plaintiff's contract claim against Lahey Clinic was based on a "respondeat superior" theory. Therefore, the judge erred in denying motions by both Dr. Hughes and Lahey Clinic for a directed verdict and for judgment notwithstanding the verdict on the contract claims.

*Battery claims against Dr. Saveren and Dr. Hughes.* The trial judge also erred in denying motions by Dr. Saveren and Dr. Hughes for a directed verdict and for judgment notwithstanding the verdict on the battery claims.

Forlano argued that he suffered a battery because he did not consent to Dr. Saveren's performing the procedure. While there may have been sufficient evidence for the jury to find that Forlano did not initially consent to Dr. Saveren's performing the myelography, that evidence alone would not support a claim of battery. The cases which the plaintiff cites to this court involve patients who were not fully informed about the risks of their treatment, *Harnish* v. *Children's Hosp. Medical Center*, 387 Mass. 152 (1982), or physicians who performed procedures other than those consented to, *Reddington* v. *Clayman*, 334 Mass. 244 (1956). Forlano testified that he knew about the risks of myelography and that he had consented to a myelography.[12] The plaintiff has cited no authority to suggest

---

[11] Although the plaintiff might be entitled to nominal damages for the breach, see *King Features Syndicate, Inc.* v. *Cape Cod Broadcasting Co.*, 317 Mass. 652, 655 (1945), he has not urged this point on us, and hence we do not think it necessary to order entry of judgment for $1.

[12] Forlano testified that he knew that the dye could be left in his back and that it could cause problems. He also testified that he knew of no other

that the mere substitution of one qualified physician for another, without objection, can constitute a battery on a patient when the patient is informed of the risks and has consented to the procedure.[13] There was no evidence that Forlano requested that the procedure be stayed in the absence of Dr. Freidberg. Cf. *Pugsley* v. *Privette*, 220 Va. 892, 897, 900 (1980).[14]

For the foregoing reasons we conclude that the trial judge erred in denying the defendants' motions for a directed verdict and for judgment notwithstanding the verdict. The judgments of the Superior Court are reversed and judgment is to be entered for all the defendants on all counts.

*So ordered.*

---

risks associated with the procedure. This suggests that he did not know of the risk that the dye would be trapped in his head and would cause debilitating headaches. However, at no point did he testify that had he known of this additional risk, he would not have undergone the procedure. *Harnish* v. *Children's Hosp. Medical Center, supra* at 158.

[13] Forlano was conscious throughout the procedure and did not object to Dr. Saveren's proceeding to conduct the myelography.

[14] Forlano also argued that the jury were warranted in finding that Dr. Hughes and Dr. Saveren committed a battery because they left the dye in his body without his informed consent. However, this evidence does not support a finding of battery. Forlano was informed of the risk the dye could not be removed.