**John T. COFFEE and Meg Coffee, Plaintiffs-Appellants,**

v.

**CUTTER BIOLOGICAL and Miles Laboratories, Inc., Defendants-Appellees.**

**No. 294, Docket No. 86–7583.**

United States Court of Appeals, Second Circuit.

Argued Oct. 28, 1986.

Decided Jan. 13, 1987.

William R. Davis, Hartford, Conn. (Kathryn Calibey, Riscassi & Davis, P.C., Hartford, Conn., of counsel) for plaintiffs-appellants.

R. Cornelius Danaher, Jr., Hartford, Conn. (John K. Henderson, Jr., Danaher, O'Connell, Attmore, Tedford & Flaherty, Hartford, Conn., Duncan Barr, O'Connor, Cohn, Dillon & Barr, San Francisco, Cal., of counsel) for defendants-appellees.

Before MESKILL,* MINER and ALTIMARI, Circuit Judges.

MINER, Circuit Judge:

John T. Coffee and Meg Coffee appeal from a partial summary judgment of the United States District Court for the District of Connecticut (Burns, J.), entered in favor of Cutter Biological and Miles Laboratories, Inc., commercial producers of blood component products. Mr. Coffee, a hemophiliac who contracted acquired immune deficiency syndrome ("AIDS"), brought suit together with his wife under the provisions of Connecticut's product liability statute, Conn.Gen.Stat. § 52–572m *et seq.*, alleging that he was exposed to the AIDS virus (or retro-virus) when he received an infusion of appellees' product, "antihemophilia factor (Human) Koate" ("Koate"). The district court held that Connecticut's "blood shield" statute, Conn.Gen.Stat. § 19a–280, barred appellants' product liability claim. We affirm.

## I. BACKGROUND

Appellants instituted this diversity suit in the district court on April 4, 1985, basing their claims on Connecticut's product liability statute, Conn.Gen.Stat. § 52–572m *et seq.* They alleged that appellant John Coffee, while he was a patient at Norwalk Hospital, received an infusion containing Koate, a product manufactured by appellees. Appellants further asserted that the unaltered Koate was in a defective and dangerous condition when administered—contaminated with the AIDS virus—and caused Mr. Coffee to contract AIDS. In the original complaint, appellants sought recovery of damages resulting from Mr. Coffee's illness and for Mrs. Coffee's loss of consortium and expenses incurred in caring for her husband.

Appellees moved, pursuant to Fed.R. Civ.P. 12(b)(6), to dismiss the complaint, contending that the claims were barred by Connecticut's blood shield statute, Conn. Gen.Stat. § 19a–280. By order dated November 5, 1985, Judge Burns converted the motion to dismiss to one for summary judgment, and invited the parties to submit additional materials and arguments for her consideration. In opposition to the motion for summary judgment, appellants argued that there was a genuine issue of material fact as to whether Koate was a "component, fraction or derivative" of blood or blood plasma, as described in the blood shield statute. They also asserted that Connecticut's blood shield statute did not bar product liability claims and that, in any event, the statute was not intended to apply to commercial producers of blood products.

---

* Although Judge Meskill was present at oral argument, he took no part in the decision of this case. *See* 2d Cir.R. 0.14(b).

In a decision dated May 2, 1985, the district court held that Conn.Gen.Stat. § 19a–280 barred appellants' product liability claims. Judge Burns concluded that the statute was intended to apply to commercial producers of blood products and that there was no disputed issue of material fact regarding the composition of Koate. However, because Connecticut's Product Liability Act prevents a plaintiff from asserting common law theories of liability when a claim is brought under the Act, Conn.Gen.Stat. § 52–572n(a), *see Daily v. New Britain Machine Co.*, 200 Conn. 562, 512 A.2d 893 (1986), Judge Burns permitted appellants to amend their complaint prior to rendering a final decision on the summary judgment motion.[1]

On June 2, 1986, a "substitute complaint" was submitted containing the product liability claims and adding negligence claims. The district court then granted appellees' motion for summary judgment on the product liability claims and directed the entry of a partial summary judgment, *see* Fed.R.Civ.P. 54(b), for appellees. This appeal followed.

## II. DISCUSSION

Appellants challenge the district court's determination that the Connecticut blood shield statute bars product liability claims and that the statute applies to commercial manufacturers and distributors of blood products. The statute provides that

[t]he implied warranties of merchantability and fitness shall not be applicable to a contract for the sale of human blood, blood plasma, or other human tissue or organs from a blood bank or reservoir of such other tissues or organs. Such blood, blood plasma, and the components, derivatives or fractions thereof, or tissue or organs shall not be considered com-

modities subject to sale or barter, but shall be considered as medical services. Conn.Gen.Stat. § 19a–280.

Under Connecticut rules of statutory construction, the reviewing court is to be guided by the language, purpose and legislative history of the statute in question. *See Anderson v. Ludgin*, 175 Conn. 545, 400 A.2d 712 (1978). The intent of the legislature generally must be found in the words of the statute itself, if the language is plain and unambiguous. *Connecticut Theater Foundation, Inc. v. Brown*, 179 Conn. 672, 427 A.2d 863 (1980); *McIlwain v. Moser Farms Dairy, Inc.*, 40 Conn.Supp. 230, 488 A.2d 102 (Super.Ct.1985). The words employed normally should be accorded their natural and usual meaning. *Jones v. Civil Service Commission*, 175 Conn. 504, 509, 400 A.2d 721, 724 (1978). Although the parties agree that Connecticut's blood shield statute is clear, their respective interpretations of that statute differ dramatically.

We agree with the district court that Connecticut's blood shield statute was intended to preclude the assertion of product liability claims arising out of a contract for the sale of blood components. The plain and unambiguous words of the statute itself clearly state that supplying blood or blood derivatives is to be considered a medical service. Senate Bill 885, which ultimately was codified as the blood shield statute, contained a "statement of purpose" to the same effect. Because transactions involving blood and blood components are to be considered services, as opposed to sales, they are outside the purview of Connecticut's product liability statute, Conn. Gen.Stat. § 52–572m *et seq.; cf. Acme Cotton Products Co. v. Lockwood Green Engineers*, 10 Conn.L.Trib. No. 34, at 10, 11 (Super.Ct. Aug. 20, 1984) (architectural ser-

---

**1.** On February 6, 1986, the district court was informed by appellees' counsel that Mr. Coffee had died. Because his death had not yet been reflected on the record, the district court elected to continue treating Mr. Coffee as a party.

If appellants choose to pursue their negligence claims in the district court, a motion for substitution should be made pursuant to Fed.R. Civ.P. 25(a)(1).

vices not a "product" within purview of Connecticut Product Liability Act).

As the district court noted, blood shield statutes in other states uniformly have been interpreted as barring strict liability claims, whether or not the statute contains an express bar to such claims. *See, e.g., Iannucci v. Yonkers General Hospital,* 59 A.D.2d 887, 399 N.Y.S.2d 39 (App.Div.1977) (construing New York statute similar to Connecticut's), *appeal dismissed,* 44 N.Y.2d 837, 406 N.Y.S.2d 757, 378 N.E.2d 120 (1978); *Hyland Therapeutics v. Superior Court,* 175 Cal.App.3d 509, 220 Cal. Rptr. 590 (Ct.App.1985) (construing similar California statute). *See generally* Annot., 24 A.L.R.4th 508, 519–24 (1983). In addition, at least one Connecticut court has held that Conn.Gen.Stat. § 19a–280 precludes product liability claims. *Depray v. St. Francis Hospital & Medical Center,* 12 Conn.L.Trib. No. 14, at 25 (Super.Ct. Dec. 19, 1985). Moreover, as the district court correctly noted, allowing plaintiffs to circumvent the exemption of blood and blood derivatives applicable to implied warranty claims by permitting them to pursue claims under the product liability statute would defeat the obvious legislative intent of distinguishing blood and blood derivatives from ordinary merchandise.

Through a tortured reading of the language of Conn.Gen.Stat. § 19a–280, appellants interpret the statute's second sentence as meaning only that contracts for sales of blood will not be subject to implied warranties. Appellants' proffered interpretation would render the statute's second sentence meaningless, because the second sentence would become a mere reiteration of the first. We cannot assume that the Connecticut legislature intended such surplusage. *See Berger v. Tonken,* 192 Conn. 581, 589, 473 A.2d 782, 786 (1984); *State v. Roque,* 190 Conn. 143, 150, 460 A.2d 26, 30 (1983). Appellants contend that the blood shield statute's legislative history supports their reading of the statute. The brief legislative remarks prior to enactment of Conn.Gen.Stat. § 19a–280 lend scant sup-

port for appellants' statutory construction. Senator Pac, the only senator to speak on the bill, referred to the statute as absolving hospitals from liability for implied warranties *or guarantees.* Statement of Sen. Pac, Sen. Hearings, S.B. 885 (May 17, 1971). Aside from the fact that the legislative history is so slight, the word "guarantee" in this context is quite ambiguous, and conceivably could refer to the absolute guarantee of a strict liability claim.

■ Appellants' claim that the Connecticut blood shield statute should not apply to commercial producers of blood products similarly is without merit. Because the statute protects only sales originating from a "blood bank," appellants argue that commercial producers and distributors of blood and blood component products such as appellees are excluded from protection by the statute. Appellants support their overly narrow definition of a blood bank by referring to legislative history and dictionary definitions. However, Senator Pac's brief reference to the benefits accruing to hospitals and volunteer donor programs as a result of the statute's enactment simply fails to address the scope of the statute's reach. In addition, appellants' dictionary references are singularly unhelpful. *See, e.g., Webster's Third New International Dictionary* 237 (1981) ("a place for storage of . . . blood or plasma").

We agree with the district court that Conn.Gen.Stat. § 19a–280 should apply to commercial producers of blood. Although the term "blood bank" is undefined in the blood shield statute, a definition is supplied in Connecticut's anatomical donations statute. As the district court noted, a "bank or storage facility" is defined in Conn.Gen. Stat. § 19a–272(a) as "a facility for storage of human bodies or parts thereof." "Parts" is further defined to include blood. *Id.* § 19a–272(e). Under the anatomical donations statute, therefore, a blood bank is a facility for the storage of human blood. This definition, of course, does not apply expressly to the blood shield statute. How-

ever, under Connecticut precedent, when the legislature has not provided a definition for an essential statutory term, the court may refer to definitions set forth in other statutes. *See Link v. City of Shelton*, 186 Conn. 623, 627, 443 A.2d 902, 903–04 (1982). Such an extrapolation is particularly appropriate in this instance because the statutes are related. Transfers of blood donated pursuant to the anatomical donations statute receive protection from liability under the blood shield statute.

Appellants also attempt to raise a disputed issue of material fact: whether Koate is a blood component, derivative or fraction within the meaning of Conn.Gen. Stat. § 19a–280. However, as the district court correctly emphasized, even appellants' expert, Dr. James O'Brien, conceded that Koate is a product derived from human blood. Dr. O'Brien merely distinguished Koate from other blood products by referring to the manner in which Koate is advertised, packaged and distributed. Appellants do not dispute the fact that Koate is a blood component product—instead, they continue to assert that significant differences in the production, marketing and distribution of Koate separate it from other blood component products. We fail to see how these considerations can alter the nature of the product itself.

## III.  CONCLUSION

For the foregoing reasons, the judgment of the district court is affirmed.