**Carol D. WEISHORN and Scott Weishorn, her husband, Appellants,**

v.

**MILES–CUTTER and/or Miles, Inc., a corporation, Appellee.**

Superior Court of Pennsylvania.

Argued Sept. 3, 1998.

Filed Dec. 3, 1998.

Irving M. Portnoy, Pittsburgh, for appellants.

Ira L. Podheiser, John D. Goetz, Pittsburgh, for appellee.

Before CAVANAUGH, POPOVICH and MUSMANNO, JJ.

CAVANAUGH, J.:

 Carol D. Weishorn and Scott Weishorn, appeal from a judgment following an order granting summary judgment in favor of Miles–Cutter/Miles, Inc. ("Miles").[1] This appeal raises an issue of first impression in this Commonwealth, requiring that we determine whether the Blood Shield Statute[2] precludes strict liability and breach of warranty claims against a commercial supplier of blood products for injuries arising from those products. The trial court ruled that the statute protects commercial suppliers and granted Miles' motion for summary judgment. Appellants appeal from that ruling. As we find that the statute was intended to extend immunity to commercial suppliers, we affirm.

Appellant Carol D. Weishorn suffers from idiopathic thrombocytopenic purpura ("ITP"), a blood disorder that causes the destruction of blood platelets.[3] Upon being diagnosed with the disorder in 1986, she routinely received transfusions of platelets into her blood. The transfusions were necessary to restore her blood platelet count to normal levels and alleviate the usual side effects of the disorder, which include bleeding into the skin, weakness and fatigue.

In May 1992, Weishorn was hospitalized at Western Pennsylvania Hospital due to a severe drop in her platelet count. After being admitted to the emergency room, she was intravenously administered Gamimune–N,[4] a preparation produced and sold by Miles, in order to boost her blood platelet count. Although the treatment improved her condition, Weishorn was diagnosed shortly thereafter with both the Hepatitis–B and Hepatitis–C viruses.

The Weishorns filed a complaint against Miles stating claims for strict liability, breach of implied warranty and negligence. The complaint alleged that the Gamimune–N wife-appellant received was contaminated with both the Hepatitis B and C viruses, causing her to contract both forms of hepatitis. Miles filed a motion for summary judgment, arguing that appellants' strict liability and breach of warranty claims were barred by application of the Pennsylvania Blood Shield Statute, 42 Pa.C.S.A. § 8333. The trial court agreed and entered an order on July 14, 1997 dismissing appellants' strict liability and breach of warranty actions. The trial court subsequently dismissed appellants' remaining negligence claim by an order dated December 4, 1997, due to appellants' failure to produce expert reports necessary to establish their claim. This appeal followed.[5]

1. Although appellee is now known as Bayer Corporation, for consistency, we will refer to appellee as Miles.

2. More precisely, the statute is titled Body fluid and tissue limited civil immunity, effective June 27, 1978, 42 Pa.C.S.A. § 8333 (1982 & Supp. 1998).

3. ITP is a condition caused when antibodies attach to blood platelets, dragging them into the spleen, the liver and other tissues where they are then destroyed. The diminution in the number of platelets in turn causes, *inter alia*, mucosal, pulmonary and gastrointestinal hemorrhaging, and is fatal if left untreated.

4. The Physician Desk Reference describes Gamimune–N as "a sterile 4.5–5.5% solution of human protein in 9–11% maltose; it contains no preservative.... The product is made by cold ethanol fractionation of large pools of human plasma.... The protein has not been chemically modified other than in the adjustment of the pH of the solution to 4.0–4.5."

5. On August 14, 1997, appellants attempted to seek interlocutory review of the July 14th order, which dismissed their strict liability and breach of warranty claims. This Court dismissed appellants' petition *sua sponte* because appellants failed to make their application initially to the trial court as required by Pa. R.A.P. 1311. On August 15, 1997, appellants filed a petition to amend the July 14th order with the Court of Common Pleas. The petition was denied because it was filed beyond the 30–day period prescribed by Pa. R.A.P. 1311(b).

The order entered on December 4, 1997, dismissing appellants remaining negligence claim, when concluded by judgment thereon, constituted a final appealable order that would allow appellants to challenge the dismissal of their prior claims. *See Inselberg v. Employers Mutual Companies*, 291 Pa.Super. 406, 435 A.2d 1290, 1291 (Pa.Super.1981) (holding that order granting summary judgment is interlocutory and non-appealable until final order is entered). In the present appeal, appellants only challenge the order dismissing their strict liability and breach of warranty actions. They do not take issue with the order dismissing their negligence claim.

We begin by noting that our scope of review when reviewing an order granting summary judgment is plenary. *Merriweather v. Philadelphia Newspapers, Inc.*, 684 A.2d 137, 140 (Pa.Super.1996), *appeal denied*, 548 Pa. 628, 693 A.2d 967 (1997). In reviewing the order, we must examine the record in the light most favorable to the adverse party and determine whether the moving party has established that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. *Scopel v. Donegal Mutual Insurance Co.*, 698 A.2d 602, 605 (Pa.Super.1997). We will reverse the trial court's decision to grant summary judgment if there has been an error of law. *Small v. Juniata College*, 452 Pa.Super. 410, 682 A.2d 350, 352 (1996).

The central issue presented on appeal is whether the Pennsylvania Blood Shield Statute immunizes a commercial supplier of human blood products from claims of strict liability and breach of warranty. Appellants argue that Miles is not protected under the statute because the statute was only intended to shield hospitals and non-profit suppliers of blood products from such claims.

In their primary argument, appellants contend that the plain language of the statute precludes a finding that the legislature intended to immunize commercial manufacturers and sellers of blood products. The statute provides:

> No person shall be held liable for death, disease or injury resulting from the lawful transfusion of blood, blood components or plasma derivatives, or from the lawful transplantation or insertion of tissue, bone or organs, except upon a showing of negligence on the part of such person. Specifically excluded hereunder is any liability by reason of any rule of strict liability or implied warranty or any other warranty not expressly undertaken by the party to be charged.

42 Pa.C.S.A. § 8333(a). Appellants contend that the term "person" cannot be interpreted as including commercial manufacturers or sellers. According to appellants, use of the term "transfusion" demonstrates the legislature's intent to limit the scope of protection to those involved in the transfusion process as opposed to those manufacturing such products. We disagree.

The blood shield statute is substantially a reenactment of the Medical Transfusions and Transplants Act 35 P.S. § 10021 (repealed) ("Transfusions Act"). Under the Transfusions Act, "no hospital, blood bank or other entity or person" was to be held liable under an implied warranty theory for death or injury arising from a lawful transplantation. *Id.* The few cases arising under the Transfusions Act extended protection to hospitals and blood banks, but our courts never addressed the issue of whether the clause "other entity or person" included commercial providers. *See Mastrangelo v. Albert Einstein Medical Center*, 12 D. & C.3d 678 (1979); *Bartholomew v. Quakertown Hospital Ass'n*, 25 Bucks 250 (1974). In 1978, the Pennsylvania Blood Shield Statute repealed the Transfusions Act and replaced the clause "no hospital, blood bank or other entity or person" with the broader term "no person."

Under the statute, "person" is not a defined term. In *Cutler v. Graduate Hospital*, 717 F.Supp. 338 (E.D.Pa.1989), however, the United States District Court for the Eastern District of Pennsylvania determined that the term " 'person' includes corporations, partnerships and associations." The district court reached this conclusion by applying the definition of "person" provided under the Pennsylvania Statutory Construction Act. *Id.* at 339; *see also* 1 Pa.C.S.A. § 1991; *Commonwealth v. Runion*, 541 Pa. 202, 207, 662 A.2d 617, 619 (1995) (stating that in absence of statutory definition, court is compelled to rely on definitions provided under Statutory Construction Act). The Statutory Construction Act defines "person" as including "a corporation, partnership, limited liability company, business trust, other association, government entity, estate, trust, foundation or natural person." 1 Pa.C.S.A. § 1991. Under this definition, the district court concluded that commercial suppliers of blood products were clearly protected under the statute. We agree with the analysis and conclusion of the district court and decide that the statute precludes actions against commercial suppliers of blood and blood products.

Appellants urge, however, that public policy will be better served by an interpretation of the statute that imposes strict liability on the manufacturers and suppliers of defective blood products. Appellants reason that "the risk of loss for injury resulting from defective products should be borne by the suppliers, principally because they are in a position to absorb the loss by distributing it as a cost of doing business." *Azzarello v. Black Brothers Co., Inc.*, 480 Pa. 547, 391 A.2d 1020, 1023 (Pa.1978). This view, however, impairs the underlying goals of the statute.

During the early 1970's, several states enacted blood shield statutes similar to Pennsylvania's. Although the statutory language varies from state to state, the statutes shielded suppliers of blood and blood products from strict liability and breach of warranty claims to promote the existence of an adequate supply of blood and blood products.[6] *Rhone–Poulenc Rorer, Inc. v. Home Indemnity Co.*, 832 F.Supp. 114, 117 (E.D.Pa.1993). In commenting on the rationale behind the blood shield statutes, the Supreme Court of Connecticut stated:

'the public policy represented by these statutes is not difficult to discern: blood transfusions are essential in the medical area and there are not now, and realistically there may never be, tests which can guarantee with absolute certainty that the donated blood is uncontaminated with certain viruses.' ... These statutes reflect a legislative judgment that to require providers to serve as insurers of the safety of these materials might impose such an overwhelming burden as to discourage the gathering and distribution of blood.

*Zichichi v. Middlesex Memorial Hospital*, 204 Conn. 399, 528 A.2d 805, 810 (Conn.1987) (quoting *Garvey v. St. Elizabeth Hospital*, 103 Wash.2d 756, 697 P.2d 248, 250 (1985)). In light of this rationale, it appears that extension of protection to commercial suppliers is proper, as well as necessary to promote the apparent purpose behind the statute.

We note that the majority of courts construing similar blood shield statutes have extended protection to commercial manufacturers of blood products. *See Coffee v. Cutter Biological*, 809 F.2d 191, 194 (2d Cir. 1987); *Roe v. Miles Laboratories, Inc.*, 740 F.Supp. 740, 742 (D.Alaska 1989); *Doe v. Travenol Laboratories, Inc.*, 698 F.Supp. 780, 783 (D.Minn.1988); *Doe v. Cutter Laboratories*, 703 F.Supp. 573, 575 (N.D.Tex.1988); *McKee v. Miles Laboratories, Inc.*, 675 F.Supp. 1060, 1063 (E.D.Ky.1987); *Smith v. Cutter Biological, Inc.*, 72 Haw. 416, 823 P.2d 717, 722 (Hawaii 1991). The minority allowing plaintiffs to pursue strict liability actions against commercial suppliers have done so under common law strict liability principles. *See Doe v. Miles Laboratories, Inc.*, 675 F.Supp. 1466, 1478 (D.Md.1987) (holding commercial suppliers subject to strict liability claim under Maryland common law); *Shortess v. Touro Infirmary*, 520 So.2d 389, 391 (La.1988) (holding that under Louisiana common law commercial supplier is subject to strict liability action).

Having determined that the Pennsylvania Blood Shield Statute extends immunity to commercial manufacturers and suppliers of blood and blood products, we conclude that the trial court correctly granted Miles' motion for summary judgment on appellants' strict liability and breach of warranty claims.

Judgment affirmed.

Judge MUSMANNO files a dissenting opinion.

MUSMANNO, J., dissenting:

I respectfully dissent. I agree with the majority that the broad language of Pennsylvania's Blood Shield Statute could be con-

---

**6.** There are two basic types of blood shield statutes. The first type characterizes blood-related transactions as the "rendering of a service," as opposed to the sale of a product, thus, preventing plaintiffs from pursuing a strict products liability action. *See, e.g.,* Ala.Code § 7–2–314(4) (1984); Alaska Stat. § 45.02.316(e) (1994); Ariz.Rev.Stat. § 36–1151 (1992); Cal. Health & Safety Code § 1606 (West 1990); Fla. Stat. Ann. 672.326(5) (West 1993); La.Rev.Stat. Ann. § 9:2797 (West 1991); N.Y. Public Health Law § 580(4) (McKinney 1994); Wash. Rev.Code Ann. § 70.54.120 (West 1996). The second approach, followed by Pennsylvania, involves a grant of immunity to those involved with the transfusion of blood or blood products. *See, e.g.,* Ark.Code Ann. § 20–9–802 (Michie 1995); 42 Pa.C.S.A. § 8333 (1994); Wyo. Stat. § 35–5–110 (1996).

strued to include commercial sellers of blood products. However, the wording of the Statute is so sweeping and ambiguous that it could be interpreted to protect from strict liability or breach of implied warranty claims **any** individual or entity involved in the blood transfusion process, including a manufacturer of a contaminated component mixed into a blood product or even a seller of defective intravenous bags, tubing, or needles used in the transfusion process. Surely, our Legislature did not intend to immunize such "persons" from liability under the Statute.

Even if the language of the Statute permits an interpretation that could include protection for a commercial seller of blood products, however, in my judgment, public policy concerns do not allow for such an interpretation. In my opinion, policy concerns dictate that we interpret our Blood Shield Statute so as to limit its protection to **non-profit** gatherers and distributors of blood and blood products. It is those entities that might be inclined to discontinue their services if required to defend against strict liability or breach of implied warranty actions. Commercial, for-profit sellers of blood products, however, would not be dissuaded from selling their products if subjected to such actions any more than for-profit sellers of other products crucial to maintaining health, such as manufacturers of certain life-saving drugs or medical devices. Sellers of blood products, like sellers of all healthcare products, should bear the burden of injuries caused by their products. These sellers profit from the sale of their products and, therefore, are able to bear the costs of such injuries, through liability insurance or otherwise, better than the innocent users of the products. For the foregoing reasons, I dissent.