**Carmelina M. SPENCER and John H. Spencer Plaintiffs,**

v.

**BAXTER INTERNATIONAL, INC., Baxter Healthcare Corporation, and Alpha Therapeutic Corporation Defendants.**

Civil Action No. 97–CV–12480–.

United States District Court, D. Massachusetts.

Sept. 28, 2001.

John B. Fleming, Sarrouf, Tarricone & Fleming, Boston, MA, for plaintiffs.

Timothy C. Blank, Matthew A. Porter, Dechert, Price & Rhoads, Boston, MA, for defendants.

### MEMORANDUM AND ORDER ON DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT

LINDSAY, District Judge.

This is a wrongful death action, predicated upon theories of negligence and breach of warranty, filed by the parents of Sharyn Spencer ("Sharyn"), who are the co-administrators of her estate. Sharyn was born with hemophilia, and the plaintiffs claim that she became infected with HIV from contaminated blood products and subsequently died of AIDS-related illnesses. The defendants are Baxter International, Inc., Baxter Healthcare Corporation (collectively, "Baxter"), and Alpha Therapeutic Corporation ("Alpha"), which collect, process, and sell anti-hemophilic blood products. This court has diversity jurisdiction pursuant to 28 U.S.C. § 1332 (2000).

Before the court is defendants' joint motion for summary judgment as to all of the plaintiffs' claims. The defendants argue that the plaintiffs cannot satisfy the causation element of any of their causes of action. The plaintiffs respond that they can trace Sharyn's HIV infection to either Alpha or Baxter's products, and that the theory of "alternative liability" relieves them of the necessity of distinguishing between the defendants as to causation.

For the reasons set forth below, the court GRANTS the defendants' motion.

### I.   Factual Background

Except as noted below, the facts in this case are not in dispute. This case arises out of Sharyn's contraction of HIV, allegedly from defendants' blood clotting factors, and her subsequent death from AIDS-related complications. Sharyn was born on October 19, 1978, with hemophilia A, a bleeding disorder that results from a deficiency in a protein, factor VIII, necessary for blood clotting.[1] The primary treatment for bleeding episodes among hemophiliacs was, and still is, the administration of blood clotting factor concentrates. Factor VIII concentrate (also known as antihemophilic factor, or AHF) is a purified and concentrated powder of the factor VIII protein, derived from the blood of thousands of donors.

Sharyn received three types of blood products in the years before she first tested positive for HIV on August 19, 1985: packed red blood cells, AHF, and cryoprecipitate.[2] Specifically, she received 200 cc's of red blood cells in March 1979; 56,872 units of AHF between March 28, 1979, and June 19, 1983; and 478 units of cryoprecipitate. Sharyn received all but twelve of the units of cryoprecipitate after June 19, 1983, when her doctors switched treatment from factor VIII concentrate to cryoprecipitate "to reduce the risk of [HIV] infection." Declaration of Sheryl M. Bourbeau, Ex. E, at 28 (Deposition of Walt A. Kagan, M.D.). During the years in question, Sharyn was treated at the New England Medical Center in Boston, Massa-

---

1.  The vast majority of hemophiliacs are male, because the gene for hemophilia is on the X chromosome and only expresses itself when there is not a second X chromosome with the healthy version of the gene. Sharyn was born with partial Turner Syndrome, meaning that part of one of her X chromosomes was deleted, and therefore the hemophilia allele was expressed.

2.  Historically, cryoprecipitate was the predecessor of AHF as a treatment for hemophilia. It is a less concentrated form of the factor VIII protein, made from the blood of only a few donors.

chusetts, the Quincy Hospital in Quincy, Massachusetts, and the Rhode Island Hospital in Providence, Rhode Island.

Each of the three types of blood products administered to Sharyn presented some risk of transmitting HIV. Though none of the three potential sources of infection can be ruled out absolutely, the plaintiffs present evidence that it is more likely, on purely probabilistic grounds, that the HIV-infected donor from whom Sharyn received the virus was among those whose blood contributed to the AHF than from among those who contributed to the other blood products. For example, Sharyn's doctor testified in his deposition that the risk of HIV transmission is "lower with cryoprecipitate than with pooled concentrates because they come from one, two or three donors as opposed to multiple donors." *Id.* at 11

Sharyn was treated with factor VIII concentrate manufactured by Alpha and Baxter, but the parties dispute whether she also may have received factor VIII concentrate from other manufacturers. Sharyn's medical records trace some of the AHF to Alpha and Baxter. *Id.*, Ex. A. However, the records also fail to identify any manufacturer for many of the doses. In a few of these cases, plaintiffs assert that the lot numbers are Baxter lot numbers, even though the records do not specifically identify Baxter as the manufacturer. *Id.* But only four of the more than fifty entries for Quincy Hospital identify any manufacturer. Sharyn's mother, plaintiff Carmelina Spencer, states in an affidavit that she brought Alpha factor concentrate to Quincy Hospital from Rhode Island Hospital in October 1982 and that on all other occasions when she saw a nurse administer factor concentrate to Sharyn at Quincy Hospital, it was Baxter factor concentrate. *Id.*, Ex. I, ¶¶ 6, 8. But this testimony does not account for all of the unidentified doses of AHF. Even viewing the evidence in the light most favorable to the nonmoving party, as I must for the purpose of this motion, the record shows that the source of some doses of AHF administered to Sharyn remains unidentified.

### III. Procedural History

The plaintiffs filed suit in Suffolk Superior Court on October 7, 1997; the defendants removed the case to this court on November 5, 1997. The complaint alleges six counts against the defendants: claims for wrongful death based upon negligence and breach of the implied warranty of merchantability, as well as related claims for punitive damages, conscious pain and suffering, and loss of consortium. The case was then conditionally transferred to the Northern District of Illinois for consolidated pretrial proceedings that the Judicial Panel on Multidistrict Litigation initiated in that court on December 7, 1993. *See In re "Factor VIII or IX Concentrate Blood Products" Products Liability Litigation,* 853 F.Supp. 454, 455–56 (J.P.M.L. 1993). Shortly after the initiation of the consolidated proceedings, the District Court for the Northern District of Illinois certified a class of plaintiffs to resolve the issue of negligence. *Wadleigh v. Rhone–Poulenc Rorer, Inc.,* 157 F.R.D. 410, 426 (N.D.Ill.1994). Though the Seventh Circuit later decertified the class on mandamus, *In re Rhone–Poulenc Rorer Inc.,* 51 F.3d 1293, 1304 (7th Cir.), *cert. denied,* 516 U.S. 867, 116 S.Ct. 184, 133 L.Ed.2d 122 (1995), the district court subsequently certified a plaintiffs' settlement class, *see In re Factor VIII or IX Concentrate Blood Products Litigation,* 159 F.3d 1016, 1017 (7th Cir.1998). Under the settlement, each plaintiff received $100,000, exclusive of attorneys' fees, for which a $40 million fund was created. *Id.* at 1017–18. The plaintiffs here opted out of the settlement

and elected to pursue their individual action. The case was remanded to this court pursuant to an order of the Judicial Panel on Multidistrict Litigation dated March 8, 1999. Following discovery, the defendants filed a joint motion for summary judgment on February 23, 2001.

## IV. Discussion

A district court may enter summary judgment only if the record reveals no genuine issue of material fact and the movant demonstrates an entitlement to judgment as a matter of law. *Perez v. Volvo Car Corp.*, 247 F.3d 303, 310 (1st Cir.2001); *McCarthy v. Northwest Airlines, Inc.*, 56 F.3d 313, 314–15 (1st Cir.1995); Fed. R.Civ.P. 56(c).

Once a properly documented motion has engaged the gears of Rule 56, the party to whom the motion is directed can shut down the machinery only by showing that a trial-worthy issue exists. As to issues on which the summary judgment target bears the ultimate burden of proof, she cannot rely on an absence of competent evidence, but must affirmatively point to specific facts that demonstrate the existence of an authentic dispute. Not every factual dispute is sufficient to thwart summary judgment;

the contested fact must be "material" and the dispute over it must be "genuine." In this regard, "material" means that a contested fact has the potential to change the outcome of the suit under the governing law if the dispute over it is resolved favorably to the nonmovant. By like token, "genuine" means that the evidence about the fact is such that a reasonable jury could resolve the point in favor of the nonmoving party.

*McCarthy*, 56 F.3d at 315 (internal quotation marks and citations omitted).

In support of their motion, the defendants assert that there is no triable issue of material fact on the element of causation, because the plaintiffs cannot trace Sharyn's HIV infection to a specific defendant's factor concentrate or even to AHF, rather than to some other blood product. The plaintiffs respond that they can satisfy their burden to establish causation through the theory of alternative liability.[3] The defendants, in turn, reply that the Massachusetts courts do not recognize this theory.

█ Causation is an essential element of plaintiffs' negligence and breach of warranty claims.[4] Under Massachusetts law,

---

**3.** In their opposition to defendants' motion, the plaintiffs also advanced a theory of market-share liability as a means of satisfying their causation burden. *See* Mem. Supp. Pl.'s Opp'n Def.'s Mot. Summ. J. at 11–13. At oral argument, however, the plaintiffs' counsel eschewed reliance on that theory. It is thus unnecessary for me to discuss market-share liability at length. I note only that the Massachusetts Supreme Judicial Court, in its only pronouncement on the subject, rejected a version of market-share liability in *Payton v. Abbott Labs*, 386 Mass. 540, 571, 437 N.E.2d 171, 188 (1982); that the theory was developed for the factually distinguishable diethylstilbestrol (DES) context, *see Doe v. Cutter Biological*, 852 F.Supp. 909, 913 (D.Idaho 1994) (though some courts have expanded it into other contexts, including AHF, *see Smith*

*v. Cutter Biological, Inc.*, 72 Haw. 416, 823 P.2d 717, *reconsideration denied*, 72 Haw. 616, 827 P.2d 1148 (1991)); and that plaintiffs have not specified which version of the theory (among the several variations that different courts have adopted) they propose. Under these circumstances, I cannot predict that the Massachusetts Supreme Judicial Court would adopt some version of market share theory in this case.

**4.** Plaintiffs' breach of warranty claim may be barred by M.G.L. 106 § 2–316(5), which renders the implied warranty of merchantability inapplicable to "the sale of human blood, blood plasma, or other human tissue or organs from a blood bank or reservoir of such other tissues or organs." Apparently, no published opinion has addressed whether factor

plaintiffs generally must identify the specific defendant responsible for an actionable harm. *See, e.g., Mathers v. Midland–Ross Corp.*, 403 Mass. 688, 691, 532 N.E.2d 46, 49 (1989) ("A plaintiff who sues a particular manufacturer for product liability generally must be able to prove that the item which it is claimed caused the injury can be traced to that specific manufacturer."). The Supreme Judicial Court has identified two rationales for this rule: "[I]t separates wrongdoers from innocent actors, and also ensures that wrongdoers are held liable only for the harm that they have caused." *Payton*, 386 Mass. at 540, 437 N.E.2d at 188. At the summary judgment stage, this rule requires that the plaintiffs establish that at trial a reasonable jury could find "that it is more probable than not that the injury was caused by the action or event (or a combination of them) for which the defendant was responsible." *Samos Imex Corp. v. Nextel Communications, Inc.*, 194 F.3d 301, 303 (1st Cir.1999); *accord Forlano v. Hughes*, 393 Mass. 502, 507–08, 471 N.E.2d 1315, 1319–20 (1984). The plaintiffs need not "eliminate all possibility that the defendant's conduct was not a cause. It is enough that they introduce evidence from which [a reasonable jury] may conclude that it is more probable that the event was caused by the defendant than that it was not." *Carey v. General Motors Corp.*, 377 Mass. 736, 740, 387 N.E.2d 583, 585 (1979); *accord Colter v. Barber–Greene Co.*, 403 Mass. 50, 55, 525 N.E.2d 1305, 1309 (1988).

■ The plaintiffs are unable to satisfy this test. The most they can hope to prove is that it is more likely that Sharyn was infected with HIV from either Alpha or Baxter AHF than from any other source. They do not claim, however, that they can trace the infection to either Alpha or Baxter alone. Therefore, the plaintiffs have not established as trialworthy the proposition that it is "more probable than not" that an individual defendant is responsible for Sharyn's death.

In some jurisdictions, courts have recognized exceptions to this general rule in cases that involve multiple wrongdoers among whom a plaintiff cannot isolate the actor responsible for the plaintiff's particular harm. The plaintiffs here allege that one such theory, alternative liability, supports their claims. The issues are thus whether the Massachusetts courts recognize this theory and, if so, whether the facts of this case fit the requirements of the theory.

The theory of alternative liability arises from the case-book favorite *Summers v. Tice*, 33 Cal.2d 80, 199 P.2d 1 (1948), in which the California Supreme Court shifted the burden of proof on causation from the victim of a hunting accident to the two defendants, each of whom had negligently fired a shotgun in the plaintiff's direction. The plaintiff could not prove which of the two defendants had fired the particular bird shot that hit the plaintiff, but the court held that the defendants would be jointly and severally liable unless one of them could prove that he *did not* fire the relevant shot. *Id.* at 86–88, 199 P.2d at 4–5. This rule, which has been incorporated into the Restatement, *see* Restatement (Second) of Torts § 433B(3) (1965) (hereinafter, "Restatement"), is based on the notion that it is unjust to allow . "proved

concentrates fall within this statutory classification, but courts applying other states' "blood shield" statutes have found that these laws prohibit breach of warranty liability for factor concentrate processors. *See, e.g., Coffee v. Cutter Biological*, 809 F.2d 191, 193–95

(2d Cir.1987) (applying Connecticut law); *Smith*, 72 Haw. at 423–24, 823 P.2d at 722. In any event, it is not necessary to reach this question given my resolution of the causation issue.

wrongdoers to escape liability for an injury inflicted upon an innocent plaintiff 'merely because the nature of their conduct and the resulting harm has made it difficult or impossible to prove which of them has caused the harm.'" *Abel v. Eli Lilly & Co.*, 418 Mich. 311, 327, 343 N.W.2d 164, 171 (1984) (quoting Restatement cmt. f).[5]

As set out in the Restatement, the theory of alternative liability requires the plaintiffs to establish four circumstances before a court may apply the theory. The plaintiffs must show that:

(1) the conduct of all of the defendants was tortious, Restatement cmt. g;

(2) the conduct of the defendants was simultaneous, or substantially so, was of substantially the same character, and created substantially the same risk of harm, *id.* cmt. h;

(3) one of the defendants is responsible for the harm to the plaintiffs (in other words, that plaintiffs have joined all defendants that might be responsible for the harm), *id.* cmt. g; and

(4) through no fault of their own, the plaintiffs cannot identify which defendant is responsible for the harm, *id.* cmt f.

The plaintiffs in this case have not demonstrated facts sufficient to satisfy these requirements. The plaintiffs can meet the fourth requirement, and the defendants do not raise the first requirement in their motion for summary judgment. However, the plaintiffs face difficult problems in attempting to satisfy the other two prongs of the test.

First, it is not clear that the defendants engaged in substantially the same conduct resulting in substantially the same risk of harm. Alpha and Baxter were both engaged in the production and sale of factor concentrates at the relevant time, but the record before me does not establish that their respective methods of screening blood donors, of testing and treating their blood products, or of warning of the risks associated with their products were the same or substantially the same.[6]

Some courts, however, have adopted versions of alternative liability that do not require the plaintiffs to establish similarity of the defendants' conduct. *See Abel*, 418 Mich. at 331–32, 343 N.W.2d at 173 (setting forth only the other three requirements as the prerequisites for applying alternative liability); *McGuinness v. Wakefern Corp.*, 257 N.J.Super. 339, 342–46, 608 A.2d 447, 448–51 (1991) (applying alternative liability when the plaintiffs developed salmonella poisoning from one of the ingredients used to prepare lasagna).

Even if I were to conclude that the Massachusetts courts would not require, or that the plaintiffs could prove, substantial

**5.** Section 26 of the Restatement (Third) of Torts (Apportionment of Liability) purports to replace Section 433B of the Restatement (Second). Restatement (Third) of Torts § 26, cmt. b. Section 26 and its comments, however, say nothing about alternative liability; indeed, a comment to another section states that the question "whether and how to apply alternative liability ... is beyond the scope of this Restatement." Restatement (Third) of Torts § 4, cmt. e. The viability of alternative liability under the Restatement (Third) is thus unclear.

**6.** The plaintiffs allege that "[b]oth defendants used similar processes to obtain donor blood and to manufacture the plasma into Factor VIII," Mem. Supp. Pl.'s Opp'n Def's Mot. Summ. J. at 9, citing as support only the conclusions of a judge in a previous case, *Ray v. Cutter Laboratories*, 754 F.Supp. 193 (M.D.Fla.1991). Nothing in the present record supports this claim, which the defendants contested at oral argument. Furthermore, previous cases are not unanimous· in finding that the risks from different producers' AHF are substantially the same. *Compare Ray*, 754 F.Supp. at 196, *with Doe*, 852. F.Supp. at 913.

similarity of conduct, there remains the requirement that the plaintiffs join all possible defendants. *See Poole v. Alpha Therapeutic Corp.*, 696 F.Supp. 351, 355–56 (N.D.Ill.1988) (adopting alternative liability in a factor VIII concentrate case because the plaintiffs had joined "all of the defendants that could have possibly caused Poole to contract AIDS"). In this case, it does not appear that the plaintiffs have done so. If one considers the range of potential sources of harm to include the blood transfusions and cryoprecipitate, then the plaintiffs have certainly failed to join all possible defendants. Even if one accepts that the plaintiffs' probabilistic evidence is sufficient for a jury to conclude that AHF was the source of Sharyn's HIV infection,[7] the plaintiffs' evidence is still insufficient to rule out the possibility that the HIV derived from AHF manufactured by a non-defendant. *Cf. Erickson v. Baxter Healthcare, Inc.*, 151 F.Supp.2d 952, 969 (N.D.Ill.2001) (refusing to adopt alternative liability because, on facts very similar to those in the current case, the plaintiff could not establish that she had joined all potential defendants: "There is no

manufacturer given for nearly half of the listed treatments, and even viewing the chart in the light most favorable to Ms. Erickson ... I cannot conclude that *all possible* defendants are joined as defendants here.").

The Massachusetts Supreme Judicial Court has never faced the question whether to adopt alternative liability. Other courts applying Massachusetts law have reached inconsistent results. While one Massachusetts Superior Court case has adopted alternative liability, *see Russo v. Material Handling Specialities Co.*, No. 9101209, 1995 WL 1146853, at *8 (Mass.Super.Ct. Aug. 29, 1995) (adopting alternative liability, but requiring that "the plaintiffs have been harmed by the conduct of one of the defendants and have brought all possible defendants before the court"), one case in this district and one Massachusetts Superior Court case have rejected the theory, *see Garside v. Osco Drug, Inc.*, 895 F.2d 46, 48 n. 2 (1st Cir.1990) (noting, without ruling upon, district court's rejection of alternative liability); *Domestic Loan & Investment Bank v. Ernst*, No. Civ.A.96–1274B, 1996 WL 680080, at *3

---

7. Another problematic issue is the nature of the plaintiffs' proof on this point. The plaintiffs appear to be able to establish that it is more likely that Sharyn became infected from factor VIII concentrate than from cryoprecipitate or blood transfusions, but they cannot rule out these other possibilities. The plaintiffs offer only "naked statistical proof," Charles Nesson, *The Evidence or the Event? On Judicial Proof and the Acceptability of Verdicts*, 98 Harv. L.Rev. 1357, 1378 (1985), a type of evidence that the Massachusetts courts have found insufficient to support a jury verdict, *see Smith v. Rapid Transit*, 317 Mass. 469, 470, 58 N.E.2d 754, 755 (1945) (granting summary judgment to the defendant when the plaintiff was struck by an unknown bus and the only evidence the plaintiff offered was that the defendant operated the sole franchise running a bus line on the relevant street). Such evidence is insufficient because it does not create "actual belief" in the truth of the prop-

osition to be proved "in the mind or minds of the tribunal notwithstanding any doubts that may still linger there." *Id.; see also Lynch v. Merrell–National Laboratories*, 830 F.2d 1190, 1197 (1st Cir.1987) (quoting *Smith*). There is some suggestion in the case law, however, that statistical evidence might be enough when the odds are sufficiently skewed. *See Kaminsky v. Hertz Corp.*, 94 Mich.App. 356, 361–63, 288 N.W.2d 426, 429 (1979) (shifting burden of proof to defendant to establish that it was not the owner of the injury-causing vehicle when evidence established that defendants owned 90% of vehicles with the relevant color and markings); *cf. Smith*, 317 Mass. at 470, 58 N.E.2d at 755 ("The most that can be said of the evidence in the instant case is that perhaps the mathematical chances *somewhat* favor the proposition that a bus of the defendant caused the accident.") (emphasis added).

(Mass.Super.Ct. Nov. 21, 1986) (declining to adopt alternative liability when plaintiff had not joined all possible defendants).

In sum, to meet their burden to demonstrate causation, the plaintiffs call upon the court to adopt a theory that is not yet Massachusetts law—a theory, furthermore, whose requirements the plaintiffs have not satisfied. Under these circumstances, I conclude that the Massachusetts Supreme Judicial Court would not adopt the theory of alternative liability.

### V. Conclusion

For the reasons stated above, defendants' joint motion for summary judgment is GRANTED.

SO ORDERED.